Mr. Fisher. Thank you, Your Honor. May it please the Court, my name is Barry Fisher and I represent the appellant, Wesley Coonce. I'm happy to answer any questions the Court may have about any of the issues in our brief, but I'd like to devote my argument today to point one in the brief, the claim that the case should be remanded back to the District Court on the issue of intellectual disability. The claim here is under the Eighth Amendment as well, but primarily under... You admit there's no basis to say as a matter of law that the client is mentally retarded and therefore could not be executed. I don't think that's something that this Court is in a position to determine. So what case would say that... When you say remand, you mean without reaching any other issues. Why shouldn't we, if that's the only reversible error, why shouldn't we affirm the sentence and indicate that a hearing is needed at some point in time, since this is a constitutional right not to be executed, not to be sentenced? I think it's up to... If this Court were to remand... What case has said that the only error was that an additional hearing is needed before the Adkins issue can be finally resolved, therefore we reverse the sentence? Well, Your Honor, I think as far as the timing of the intellectual disability issue, the Webster case in the Fifth Circuit acknowledges that the phrasing of the statute in terms of a sentence cannot be carried out on someone who's mentally retarded indicates it can be raised post-sentence. As far as what this Court should do... Well, it clearly can. We agree. Harper, and there are all these kinds of issues. I think as far as what this Court should do with the other issues in the brief, I think the Court could pre-termit those and remand just on the intellectual disability issue, or it could reach those other issues. That's really up to the Court. No, that's not my question. If we decide that the other issues are without merit and should be affirmed, what authority is there that we would still reverse the sentence because a hearing at some point in time is needed on the Adkins issue? Do you have authority for that? I kind of doubt it. Well, Your Honor, I don't think it's come up in the Ortiz case. That's why I want to know. I want you to go ahead, but my suspicion has been there is no authority on that, and I see no reason why the sentence could not be affirmed. Well, I think, Your Honor... Because there's no Adkins flaw in the sentence. Well, Your Honor, if you're suggesting that the issue be relegated, say, to 2255... Whenever. Eve of execution. Well, I think that would be really at odds with the law and with sound policy. I want to know if it's at odds with the law. You haven't told me that it is yet. Well, I think the law in 2255 is a narrow remedy for issues that could not be adequately litigated on appeal. This issue can be litigated and is being litigated on appeal. I think there are also policy reasons. To put this issue off, say, to 2255 or even beyond would be, I think, unfair to the parties. We can figure out the policy. I just want to know if there was law. Go ahead with your argument. I would also say the Webster case, I think, also indicates that this can be raised post-sentence, and at that point it was determined by the judge after the sentencing hearing. It wasn't relegated to a later stage. Is the standard for mental retardation, the Atkins claim, is it the same under Atkins, the constitutional test, as it is under the Federal Death Penalty Act? We say it's the same. Certainly I think our claim is clearer and stronger under the statute, but we think under the canon of constitutional avoidance they should be harmonized. Well, expand on that, because I think there's... The thing I'm struggling with is there are other federal statutes that deal with similar terms, developmentally disabled, which defines it as 22 or under, not 18 or under. And so I'm just curious as to why you're conceding or taking the position that they are the same. Well, I think in terms of interpreting the federal statute, I think this court needs to look to the developmental disabilities area and the social security area, because the canon of impairing materia and other canons of statutory construction say that when you have a phrase in a statute, like mental retardation, that's all the statute says here, mental retardation, or a subphrase, which was in the legislative history, and both sides agree is in the standard for prong three, developmental, period, and it's not defined. If you've had prior statutes where it's been defined either by Congress or by the relevant agency, which is what's happened with the social security provision, which is also H-22, that the court should look to that, should rely on that. And it's not necessarily because we have a fiction that the legislators who drafted this provision were thinking about that, but it's more because, as Justice Scalia talked about in his treatise, it's about making sense of the law. And clearly, if you look back to when this statute was enacted in 1988, you had the developmental disabilities area of law and the social security area of law, which both defined the end of the developmental period as H-22. I think it's important the government, and those are still the law in both those areas, the government. The impairing materia canon, which you've invoked, really relies on related statutes, and arguably a statute dealing with sort of social legislation like disabilities and compensating disabilities and things like that, social security is going to have a different purpose. And I'm not sure that they're related enough that the impairing materia canon would necessarily also let you know what the Death Penalty Act says. I think the issue, Your Honor, is fascinating on is one that was fought out in the Supreme Court in Hall and Moore, and I think the Supreme Court answered it. The Supreme Court specifically faulted Florida, and especially Texas. I think Moore is the clearest expression for having different standards in the death penalty context, which were less protective than they had in the education benefits context. And this was also harped on by the dissent. The dissent made the point that you're suggesting, that these are different areas. And they're really not, because as we talk about in our reply brief, if you go back to the legislative history of the developmental disability statute and you go back to what the Social Security Administration said about their age 22 cutoffs, they were both based on science. And clearly the current science here, and I'll get to that in a moment, supports age 22. And I just want to give the Court a quote from Moore, which I think really the Supreme Court capsulized this. They said, quote, Texas cannot satisfactorily explain why it applies current medical standards in other contexts, in other words, education and benefits, yet clings to superseded standards when an individual's life is at stake. So the Court was making the point that, if anything, the standard should be more protective in the death penalty context, but certainly it shouldn't be less protective. So I think that issue is really addressed in Moore. Why isn't your client's condition addressed in the second sentence of 3596C? Because his disability arose out of a car crash at age 20, whereas the Social Security, for example, the reason the focus on development is to isolate genetic rather than environmental disabilities. So the age isn't as important as the source of the deficit, is it? I don't agree. I don't think that's true about the Social Security area. Well, I've had a number of those cases, so I can tell you that's the focus. Well, Your Honor, I think that the regulation in the Social Security area, and the Social Security Administration talked about this, is it's based on the American Psychological Association, which has long had an age 22 standard. I don't care what it's based on. I'm talking about what its purpose is. Its purpose in those cases, because they're child disability cases typically, is to focus on whether the intellectual deficits have been basically from birth. Your Honor, it may be that most of the cases fall in that category, but many, many cases involve subsequent onset, including brain. We've cited many Social Security cases, including in this circuit, where the onset was at age 20, including brain injuries. And those are clearly covered. That's what the law says, and this Court has acknowledged that too, that it's an age 22 standard. I would like to talk a little bit about the legislative history and also about the current scientific standards and why those also support our position in this case. The legislative history, there's a short discussion in 1988 between Representative Levin, a Democrat, and Representative Gekas, who was a Republican. He was the floor manager for the bill. And they read into the record a three-pronged definition, and I think this is one of the areas where we in the government agree. There's a general definition of mental retardation, which is now called intellectual disability, and this has been a consistent definition across standards, across time, across jurisdictions. The general definition, deficits in intellectual functioning, prong one, deficits in adaptive behavior, prong two, onset during the developmental period, prong three. So that definition is read, and as soon as Representative Levin says manifested during the developmental period, he pauses, and then he says, that is in the early part of their lives, quote. Doesn't say age 18. Representative Gekas doesn't say age 18. Nobody says age 18. And Representative Levin and Representative Gekas say a couple of other things that I think are very important for the court in figuring out sort of to the extent the court sees the legislative history as relevant, figuring out the legislature's intent. Representative Levin says this definition that I've just read, this general definition, so prong three just says onset during the developmental period. He says this is one, quote, universally accepted in the courts. And then Representative Gekas has him repeat that. He says, so this is the nationwide definition? Yes, he says. Well, my understanding of the legislative history, though, is that the Congress was relying on the medical consensus, the same medical consensus or consensus in the scientific community that the Supreme Court looked at at Atkins. And so in Atkins it was about age 18, and in the follow-up cases it was about age 18. Am I wrong about the legislative history? I mean, that seems to be what the medical consensus was at the time. Well, I think you asked several questions. Sure. I'll try to answer all of them. I think that by adverting to the standard in the courts, and, again, this is before there had been any court decisions about mental retardation in the death penalty context. There was only one other state, Georgia, that had enacted a death penalty exemption for the mentally retarded the year before, so there had been no cases. So when they talk about the standard in the courts, they're clearly talking about these other areas. But as far as the scientific consensus, I don't think there was a clear scientific consensus at that point. It may be that the predominant consensus favored age 18, but I think this court, in interpreting the statute and applying the Constitution, clearly has to go with and apply the current medical standards, the current scientific standards, for two reasons. One is Congress enacted a provision here with a scientific term, mental retardation, and the definition they read had scientific terms. Clearly, they meant this to be interpreted according to the best current medical understanding. If you look at the discussion, a very short discussion, Representative Bartlett talks about this, and he says, look, this is something that's going to be applied, and he uses the phrase, in scientific terms by qualified psychologists. The other critical reason that the court needs to interpret the statute in light of current medical standards is that's what the Supreme Court said in Hall and Moore has to be done. That's what they specifically faulted Texas and Florida for not doing, for applying outmoded medical standards. And they said, and in fact, this court in Sasser was looking at the Arkansas statute and said, clearly, we need to interpret this statute under the principle of constitutional avoidance, because the court said in Hall and Moore, current medical standards need to inform the application of the mental retardation exemption. So I think the issue then becomes, what are the current medical standards? And your statutory basis for this is that mental retardation is a scientific term, because, I mean, essentially what you're doing, I think, is asking us to do something we normally do not do. We look at statutes at the time they were enacted and try to figure out what they meant at that particular time. You're suggesting that it evolves over time, kind of like the Supreme Court's Eighth Amendment jurisprudence, and your hook for that then is the mental retardation term, which you say might have a different meaning at different times. Absolutely, Your Honor. I think what's very notable about this statute is the only thing it says is mental retardation. If you look at other states' statutes, some of them try to really drill down into the sub-sub-definition. So you have statutes that said the first prong has to be under, you have to have an IQ under 70, which back in the late 80s, even the early 90s, was consistent with some of the science. The science, and the court said of the science, it evolves because we have a, quote, improved understanding. So the science evolved, and those states, like Florida, for example, and Hall, ran afoul, because they had pinned their statute to outmoded science. So I think from the fact it's a scientific term, from the debate where it's talked about by Representative Bartlett, says this is a scientific term, it's going to be determined by qualified psychologists, and from the fact that the court didn't try to drill down into sub-definitions. It left the term mental retardation, which is clearly a scientific term of art. Counsel, can Congress delegate that legislative authority to other sources? I don't think Congress is delegating it, Your Honor. I think it's consistent with what the Supreme Court said in Moore. But those are constitutional cases. You're completely conflating statutory interpretation and constitutional interpretation. Well, Your Honor, I think Congress enacts other kinds of statutes that have scientific terms. So if Congress, say, enacted a statute that said we're going to classify a certain drug, depending on whether it has legitimate medical uses, I think it's reasonable to assume Congress meant that that determination was going to be contemporaneous. Well, it's delegated to an agency almost always. And then you have the delegation question that Judge Grass just posed. I think delegation is too strong a term, because I think in a delegation context, when you're talking about Chevron, that really is the agency deciding. And I think what the Court made clear in Moore and Hall is we're not saying that the APA or psychologists have the ultimate decision. Courts have the ultimate decision, and they have to weigh different factors. But the science, the current science, has to be a very important factor. So I wouldn't call it delegation. But I do think that Congress was saying this is something. Well, that's the way EPA treats it all the time. Well, again, I don't think this is quite the degree of delegation you have, like, in a Chevron situation. I think it's something different. Now, Chevron is a standard review. Don't mix that in. The question is whether Congress intended to delegate in this manner, to delegate to the courts, which is not. . . Congress doesn't delegate to the judiciary the authority to change the law, so to speak. I wouldn't say, again, it's changing the law. I think it's interpreting the law according to, among other things, current medical standards. And I think the important thing about current medical standards here is to look at the American Psychiatric Association, the DSM-5, which came out in 2013. If you look at the Supreme Court decisions, particularly Hall and Moore, clearly this is the central authority for mental retardation. And the American Psychiatric Association abandoned an age 18 cutoff and said it's generally the developmental period. Now, the government says this is really just a technical rewording. It didn't matter. That's illogical on its face. But also, in our brief, we talk about all the various authorities which acknowledge this was a very purposeful, meaningful switch because the APA understood that 18 was no longer defensible as a cutoff for the developmental period. I mean, they're back to the delegation question. You're saying that Congress in 1994 told the courts that the governing standard will be what the Psychiatric Association does in 2013. That simply doesn't sound right to me. Well, I think, Your Honor, again, this debate was had in Hall and Moore. And I think the Supreme Court addressed that. Those are constitutional cases. We're arguing about the statute. Now, whether the two have to overlap or should overlap is a different issue than what you're discussing with my colleagues now. Again, I think that there are indications and support for interpreting the statute in light of current medical standards. And I think the principle of constitutional avoidance really requires it because it wouldn't make sense to say, well, under the Constitution, we look at current medical standards. But under the statute, we're going to look at 25-year-old standards. The government relies, I think, their entire argument both on the legislative history and on the current scientific standards is the AAIDD. And I want to say just a little bit about that. During the debate, during the discussion, there was a reference to the general standard being one from the AAIDD. And it was. And the government says, well, the AAIDD also had this separate definition of the developmental period where it said it ended at age 18. So we should assume that Congress meant to incorporate that. That was never mentioned by the two representatives who were discussing this bill who had drafted it. The things they said were at odds with that, as I said. And it certainly wasn't something that any of the other legislators who voted for the bill would have known about. As far as the science behind the AAIDD, its manual was from 2010. So it's almost 10 years old. And even at the time, it acknowledged that an age 18 cutoff was scientifically questionable and really largely based on other non-scientific considerations. The other important thing about the AAIDD the court should understand is that it's not primarily a scientific organization. And the government itself has repeatedly said this in their briefs in ID cases in federal court. They've said it's an advocacy organization. We've talked about other scientific authorities for the current science being the end of the developmental period. And if the court has doubt about that, again, one of the court's options is to remand for fact finding in the district court about that issue. The court could remand, could set the end of the developmental period and say it's 22, which I think is supportable. It could say we're not going to set a cutoff. We're just going to say it's the developmental period. And again, Mr. Koontz's standard here for what he has to meet at this point is a very low one under Brumfeld, the Supreme Court's decision in Brumfeld and this court's decisions in cases like Sasser. It's really an initial pleading standard. We're not saying, as I mentioned to Judge Loken at the start of the argument, we're not saying this court should deem him mentally retarded. We're saying it should remand the case. Counsel, what if there was a situation where there was no clear consensus among the scientific community as to what the age of development was? Does that mean the statute can't be enforced? No, Your Honor. I think, again, the scientific standards are one factor. I think if there were not a consensus, I think the court would need to try to look at the scientific standards. That might be a reason to remand to the district court for testimony. But I think there are numerous other indications in this case, again, the imperative materia principle that favor our interpretation. And I think also the canon of interpreting the statute as a whole. If you look at the federal death penalty statute, the 1988 one and then the 1994 one that incorporated the same provision, these were model protective statutes. There was a lot of opposition to enacting any federal death penalty. And the compromise that was reached was to have a super protective statute. It had special provisions that the Constitution did not require in the areas of race, counsel. The whole mental retardation exemption was not required by the Constitution. Special provisions on age. The overall intent of the statute, which, again, there's a canon that this court needs to look at particular provisions in light of that. The overall intent of the statute was to make it maximally protective. The government's argument is don't pick the ceiling, pick the floor. And, again, I don't even think it's a constitutional floor because we think 18 would be unconstitutional. But, clearly, if it is constitutional, it's the floor. You've got about half the states that have that and the other half that don't. And I think that would go against the overall intent of the statute. A few moments ago you mentioned, before answering Judge Graza's question, that perhaps we don't set an age. We just say it's just during the developmental period. But youth develop at different speeds and at different rates. And so I'm wondering how such a standard would work. Somebody hits the end of the developmental period at age 22 and another person hits it at age 19. In your view, how would such a proposal work? Well, I'm not sure what's gone on with the APA moving to the general standard. It's really a function of differences between individuals, no doubt. I don't dispute that there are. I think it's more about where the general line is. I think the important answer to that question is this is a pretty unique case. I have not come across any other case where the issue of where you draw the developmental period line, whether it's 20 or 22, the case really turns on that. And so I think it's not going to affect a number of other cases. I think usually you're going to have people clearly on one side of the line or the other. And again, I don't think the science supports the idea that there are individual differences so much as where we precisely draw the line isn't clear. I think 22, the science certainly would support 22 and the law. I think they would both also support this court saying simply developmental period, we're not drawing a cutoff. And we're going to say Mr. Kuntz made a sufficient preliminary showing to occasion a remand. The last point I want to make and the last canon that I think supports our position here is the rule of lenity. And the Supreme Court has said in Moscow, if reasonable doubt persists about a statute's scope, that the rule should be applied. And I realize this is something that criminal defendants often appeal to and it's often not appropriate. But I think it is appropriate here because I think there really is, at worst for our position, lingering ambiguity. And I think the rule of lenity applies here particularly for two reasons. Let me close with those. The first is the Supreme Court in its line of cases on intellectual disability, particularly Hall and Moore, has made clear that it wants courts to be especially careful not to miss defendants who are mentally retarded. It's sort of almost a special rule of lenity in the mental retardation context I think is what the court's talking about in Hall and Moore. And the second point I want to make about this case is this case really embodies, indeed it epitomizes, all the reasons that Congress in the federal death penalty statutes and the court in Atkins and other cases exempted the intellectually disabled. Mr. Kuntz has a severe disability. He has an IQ of 71, which is in the third percentile. And there was evidence that it impaired him in his basic functioning in many respects, both before he went to prison and after he went to prison. And his handicap impairs the very elements of executive functioning, the decision-making part of the brain, that Congress, one of the legislators in the debate, and the court in Atkins identified as important. Memory, attention, reasoning, processing. Now, this is all in the record? Yes, Your Honor. Or is this the record you want a chance to make? Well, Your Honor, there is certainly a sufficient preliminary showing on these things in the record, and we would want to, I think the government wants to obviously rebut it at a hearing, and we might have additional evidence, but there is evidence of all these things in the record. Impulsivity, regulating emotion, and being a follower when confronted with a more dominant personality has happened in this crime. These are all the things that Congress and the court identified as, number one, reducing blameworthiness, and number two, creating a risk of a wrongful execution, because these deficits can lead to false or exaggerated confessions, they can lead to difficulty assisting counsel, and they can lead to jurors not giving due regard or even treating as aggravating these deficits. And all these things happen in this case. Thank you, Your Honor. I'll reserve the rest of my time for rebuttal. Thank you, counsel. Mr. Valentini. Good morning. Francesca Valentini for the United States. May it please the court. You're going to have to speak more clearly. I didn't catch a word of that. Francesca Valentini for the United States. May it please the court. Defendant Coons raises two claims on appeal. The first is the same constitutional claim that he raised below. That claim he only raises in passing. In the district court, he expressly conceded that he does not meet the medical definition of intellectual disability because his alleged deficits trace back to an injury he sustained when he was 20 years old. What's the record cite for that admission? It's at docket entry 795 of page 4. That's a motion that Defendant Coons filed in the district court shortly after . . . It's not in the appendix? I don't believe it's in the appendix. It's available in the electronic record on paper. On what basis do lawyers prepare these appendices? The first cite to the record you make is not in an appendix that's about three feet high. I don't understand the psychology of lawyers preparing appendices, but go ahead. I apologize for the omission of that. Well, it happens all the time. Instead, in that motion, Defendant Coons argued that Hall expanded Atkins beyond the medical definition of intellectual disability to include intellectual deficiencies that do not manifest themselves after age 18. Instead, and this is a quote, instead of during this developmental period. That constitutional claim lacks merit as a matter of law, and Coons barely renews that claim on appeal. The second claim that Defendant Coons raises on appeal is a statutory one, of mentally retarded defendants. That provision, sections 1396C, does not require a pre-19 . . . He claims that that definition does not require a pre-age 18 onset. Every relevant consideration, however, that informs the interpretation of that statute counsels otherwise. First, in terms of the case law, the Supreme Court in Atkins articulated the age of onset requirement as requiring the disability to become manifest before age 18. This court in Ortiz, in 2011, repeated the same formulation. It said a mental retardation diagnosis requires defects, deficits, originating before age 18. These cases did not directly interpret or did not turn on the age of onset requirements. However, the extraordinary attention that the Supreme Court and this court have given to intellectual disability in the death penalty context in recent years makes it exceedingly clear that this were not just passing dicta. These were thoughtful considerations of the applicable standard, and they were derived by the controlling medical definitions. Particularly illustrative is this court's decision in Ortiz, of course, which was a federal death penalty case. What do we do with the fact that opposing counsel says, well, that might have been true in 2011, it might have been true in the 1990s that age 18 was the cutoff, but now it's age 22 and the scientific consensus goes a different direction? I think there's both a legal answer to that, and in terms of statutory interpretation, it's far from clear. As your honors pointed out before, the ordinary task of a statutory interpretation is interpreting the statute as of the time of enactment. So that would be the first response. To the extent that considerations of constitutional avoidance inject subsequent developments into the definition, Defendant Kuhn's position is unsupported on the basis of the medical evidence. The American Association of Intellectual and Developmental Disabilities Manual defines intellectual disability as originating before 18. That has been the threshold under the definition of the American Association for Intellectual and Developmental Disabilities since at least 1973. Age 18, the manual explains, is a generous criteria, and this is also a quote to the manual, because the primary time of brain development and change is in the prenatal, infancy, and childhood years. And that is at page 93 of the manual. The DSM-IV, the previous manual issued by the American Psychiatric Association, also expressly provided for an onset requirement of before age 18. Now, in the DSM-V, as opposing counsel points out in their brief and today at oral argument, the DSM refers to deficits originating during the developmental period. But in the explanation of what that means, the DSM also makes clear that the developmental period means during childhood or adolescence. In both terms, according to most, as we explain in our brief, according to a most common understanding and medical definitions, end by age 18. In addition, I would note that the DSM-V, under differential diagnosis, also points out, and this is also a quote to page 40 of the DSM-V, that intellectual disability is, quote, distinct from neurocognitive disorders, which are characterized by loss of neurocognitive function. And that is entirely consistent with what intellectual disability is. Intellectual disability is a developmental deficit. It's not something that happens at some point during one's life. And for that reason, it's different in kind as a medical matter, as the DSM-V shows, confirms, as well as a legal matter. The Supreme Court enactments make clear that to the extent a defendant cannot show intellectual disability, any relief will not be entitled to the exemption that was announced under the Eighth Amendment in Atkins. It will have any relief that will come only under the different standards that apply to the Ford and Panetti requirement of competence to be executed. And we also heard today about the legislative history. Those neurological issues would fall under the second sentence of 3596C, in your view? A defendant would have, a capital defendant would have to, they could, a capital defendant would have to show. They can result in the showing you need to make in the second sentence. Correct. Even if you were not genetically or whatever the word would be eligible for the first sentence. Correct. And the defendant would have, however, to show consistent with the second sentence of section 3596C. Inability to understand the penalty and so forth. Right, and draw a rational connection between the crime and the penalty. But that would be the legal rubric under other type of mental illnesses will fall. What I think defendant is trying to do in this case, and appellant is trying to do in this case, is to blur the distinction between those two distinct strains of jurisprudence. We also heard today from opposing counsel again about the legislative history. I think as our brief makes clear, the legislative history strongly supports the view that the onset requirement was set at age 18. The colloquy, well first, Representative Levin, who was the sponsor of the legislation, read this definition that was taken from the definition of the American Association then of Mental Retardation, which has now changed its name to American Association of Intellectual and Developmental Disabilities. Now that definition, the core definition, referred to the developmental period. However, the manual that the American Association of Mental Retardation had issued at the time, that was in force at the time, on the same page defined developmental period as, quote, the period of time between conception and the 18th birthday. It is inconceivable, given the attention that the definition of mental retardation received as part of the debate of the 1988 Act, the precursor of the FDPA, that Congress might have intended to incorporate the definition from the American Association of Mental Retardation, but not what that definition meant. That is the illogical inference that Defendant Coons is asking the court to draw, and it's one that we submit would be inappropriate. To the extent that it's relevant to interpreting the statute, as we explained in our brief, the prevailing view of the jurisdictions also strongly counsel against relaxing or abandoning the age 18 onset requirement. Of the 13 states that have capital punishment, 17 have adopted an age 18 onset requirement. Four adopt no definition of intellectual disability, and six use the term developmental period without further elaborating on the definition. That means that at least 17 and as many as 27 jurisdictions out of 31 that have capital punishment impose an age 18 requirement. All of this makes sense because the distinction that the law has traditionally drawn between intellectual disability and other forms of mental illness makes sense because, as we mentioned before, intellectual disability is a quintessential developmental deficit. And with that comes added difficulty in developing the skills necessary for coping with certain situations, for instance. Such generalization cannot be extended to other mental illnesses, even when those mental illnesses correlate with some loss of cognitive function. Finally, unless the court has any further questions, to touch on the opening question that Judge Loken asked at the beginning, we are aware of no authority and no reason why the sentence should not be affirmed. Webster has been cited for some dicta support for the proposition, some loose suggestion that maybe the claim can be raised at a later point. If that's possible, that's something that would have to be litigated in due course. For now, the only thing that is before the court is that that sentence that was imposed is not a death warrant, is not a surrender of the defendant to the marshal for execution, and any further claims would have to be adjudicated in that form. Counsel, on what was before the district court and what's before us, one of the things, and maybe this doesn't make any difference since both parties treat it the same, but the Federal Death Penalty Act claim wasn't before the district court that I can tell, and I'm going to ask opposing counsel about this on his rebuttal. The Eighth Amendment claim clearly was. What's the significance of that, if any, in the government's view on that procedural quirk of this case? I think the significance is only that the statutory claim would have to be reviewed under a plain error standard because it was not raised below as opposed to a de novo review as would be subject to if it had been raised below. Because there's no clearly established precedent, there was no error that was plain because there's no precedent for sure, and I think opposing counsel probably recognized that. For that reason alone, any statutory error would not be plain error. Well, that brings the timing issue into clear focus, doesn't it, as to whether it has to be done now with the sentence reversed. If it's plain error review, there's obviously an opportunity to make available in the time Adkins requires for this relief. The third and fourth prongs of Olano. Right. We have not contested the third or fourth prong of Olano. If there is a showing in this case of... You've not raised that? We have not raised it in... Did you argue plain error review? We did argue plain error review. You can't argue plain error review without raising them. You may not discuss them. Right. We did not discuss them. We relied... We put in focus primarily the requirement, the second requirement of Olano, which is that the error has to be plain. What about the third and fourth prong? At this point, it would be premature to... Because the only claim is that he would have had to receive a hearing. Or that he has to receive it now. Right. With the sentence reversed. And how does the failure to do that significantly interfere the fourth prong and the third prong as well? There's neither a significant impact on rights, is there? Or is there any shaming of the system, so to speak? Well, there's certainly no shaming of the system. Well, the fourth prong. It's got more words than that. Right. There's no shaming of the fourth prong requirement. As to prejudice, I don't think that the defendant has... The defendant would have to show that by not receiving that hearing, his rights were substantially affected. To make that showing, we'll have to show they would actually have prevailed at that hearing. And on this record, could not make that showing. For that reason as well, we would ask that the court affirm the judgment and the sentence. Does plain error actually apply? And the example I'm going to give, or hypothetical I'm going to give, is suppose that a child is sentenced to death. We don't know at the time because we don't have the birth certificate that the kid is actually 16, not 19. And so they don't argue it. But it comes up on appeal, and it turns out that the kid was actually 16 at the time he committed the offense. It seems that this is more of a complete bar. If you use the retroactivity jurisprudence, it's a complete bar on liability, complete bar on the sentence. And so does plain error really apply under those circumstances, or would it just simply not apply because it's an absolute bar? I think it would apply. I think your hypothetical is different because the hypothetical is premised on the notion that in that case, there is no question that the defendant was actually not 18 at the time. So the facts, as I understand the hypothetical, are undisputed, and the law is also undisputed. So the error is clear. And so in that case, obviously the execution of the defendant will result in prejudice and will certainly implicate prong four of Olano. So in that sense, I think the hypothetical that Your Honor is posing is different. Here we do have what is legally, I think everyone would agree, a novel claim as to the age of onset requirement. And plain error really, as a general matter, as a matter of first principle, is about not forcing, not putting courts of appeals in the difficult situation of writing entirely new law without, in part, at least prong two, without the benefit of the considered judgment of the district court. That's one of the values, one of the underlying principles. So you think in my hypothetical, plain error review is still the applicable standard of review. It's just that it basically grants, you apply all four prongs and the defendant gets relief in that case. That's exactly my answer. Well, and the difference is that here the error is not holding a here. In the age case, it sounds like if on appeal it is clear as a matter of law that in fact the defendant was underage, then the sentence is defective. Correct. But counsel concedes that we can't decide that now. So the plain error is not holding a hearing. The question is what does that, when does the hearing have to be held? Why does plain error review ever permit the reversal of the sentence and go back to square one for a constitutional issue that does not come into play until execution? So the constitutional issue, I think, would come in with the imposition of a death sentence. Imposition of a death, are we talking sentence or execution? That's the distinction. Right, I'm talking about the sentence. Well, if as a matter of law the defendant was mentally retarded and that is determined before trial or before the sentencing phase, then that dictates the sentence. Correct. But that didn't happen here. Correct. And I think I take their argument to be that . . . I know what their argument is, but if it's plain error review, it's not plain error. That's exactly the position in our brief, Your Honor. No, it's not plain error under the third and fourth prongs. Even if it was clear that the district court should have held the hearing given the preliminary showing. That does not entitle the defendant to plain error reversal of the sentence. It is accurate that our plain error argument focuses on the second prong of a line and not the third and fourth prong. So you're standing up and conceding that . . . I am not conceding. All right. I'm asking you to comment outside of your argument. Right. I haven't studied your brief on this point, but if that's where you stopped, it's poorly argued. As I mentioned before, we think that the logic of the argument that Your Honor just explained with respect to the third and fourth prong would be an independent reason to affirm this judgment under the plain error standard that we have argued applies in this case. Counsel, could you please address the assigned error, I think it's number eight, regarding the discussion that took place with the jurors about their safety and the protesters with the defendant absent? Yes, absolutely. One second. I apologize for that. Although the record does not explain what the court's reasoning was in removing the defendants, there is no plausible basis to conclude that the brief removal of the defendants in this case was prejudicial. To begin with, to put things in context, the removal of the defendants spanned for at most a couple of pages, I believe three paragraphs, only two or three paragraphs of transcript out of a 23-day trial. The reason and the discussion for the colloquy with the jury was entirely non-substantive and ministerial. It did not relate to the substance of what was before the jury for adjudication. In fact, the substance of the communication was itself not only benign but unassailable, as it was the court's responsibility in an effort to guarantee the safety of the jurors in case the court simply alerted the jurors that there could be a protest going on outside. The court was also extraordinarily careful in not overemphasizing or overplaying the threat or any threat. It did not suggest in any way that the protest would pose any threat to the jurors. In fact, it made clear that it was only advising the jury out of an abundance of caution and had no reason to believe that the protest involved more than a handful of jurors. Did the court explain why the defendant was not to be present? No, there was . . . Okay, so now you give the explanation that you anticipate the district court would have given if prompted to. Why are you doing that, Judge? One . . . You haven't said a word about that. What would be a rational basis for excluding the defendant from that discussion? Again, going beyond the record, if one were to . . . No, no, that's not beyond the record. Was the court asked for an explanation? The court was not asked for an explanation. All right, so now we're talking basically plain error review again. The court was not prompted to explain a decision which is now alleged to be unconstitutional. What would a thoughtful and sophisticated trial court have said if asked? One possibility is that the court, as it did towards the end of the colloquy, asked the jurors whether they had any questions or any concerns about the protest and whether the court solicited any questions for the jurors. It is possible that, in an entirely benign fashion, the court thought that not having the defendant's presence would cause the jurors to be more forthcoming or more willing to voice any concerns, even if, in fact, they had any. Beyond that, it's hard. The opposing counsel hypothesized some inference that the jurors could have drawn about the defendants being somehow associated with the protest. But, in fact, if that's what the court had thought, that would have made the removal of the jurors even less sensitive. It would have made it less likely that the jury would have removed the defendants because the defendants would have already, in the hypothetical, known about the protest. So there would have been less, not more, reason to remove the defendants. The only reason, and it's a benign reason that appears from the record, is that the court likely wanted the jurors to feel comfortable asking questions. As the court solicited those questions at the end of the colloquy, this is something that didn't happen very often in this trial. There's not many instances in which the court asked the jury for its input or if it had any questions. This is one of the few instances in which it did. And one could infer that the court just wanted to assure itself that the jurors, if in fact they had some concern about this protest, they wanted more information that they would not feel shy about coming forward with that request. Unless your honors have any further questions. Oh, the last point, your honor, that I would also point out, is that counsel was present throughout the communication with the jury. And that is also a consideration that this court's cases have highlighted time and again as sort of being indicative of no prejudice. And not only was counsel present, but it did not interpose an objection to the substance of the communication, to the advice that the court actually gave to the jury. So to use this court's words, this is one of those instances where the presence of the defendants would have been but a shadow. It would have added nothing to the proceedings. Unless your honors have any further questions, we would ask the court to affirm the judgment and the sentence in this case. Mr. Fisher for rebuttal. Yes, thank you, your honor. The suggestion was made that this claim could be relegated to shortly before execution, much like a claim of competency to be executed under Ford and Panetti. But those are two completely different kinds of claims. The claim of competency of executed is not ripe until the eve of execution because it's determined based on the defendant's mental state at that moment. A claim of mental retardation is backward looking. It's historical. Given the way the federal death penalty operates, Mr. Kuntz may not be on the eve of execution for decades. To put this off until then would make it much more difficult to conduct that historical inquiry. It would be an unnecessary burden and delay and impose potential costs on the court system, on both parties, on the victim's family, on the defendant, that if Mr. Kuntz is intellectually disabled, don't need to be imposed. I would also call the court's attention to Ortiz in this circuit and Webster when issues of mental retardation came up post-sentence in those cases. In Ortiz, it was raised for the first time in 2255. In Webster, it came up after the sentence. Neither court said, well, we can just put this off until later. They both dealt with it when it was raised. And I think that's what the statute calls for. Judge Strass, you asked about plain error. This clearly is not subject to plain error for three reasons. One is the statute. And we've already talked about the statute, that it can be raised at any time. And that's clear. The second is this court repeatedly in its mental retardation decision, Sasser, Simpson, Jackson, has said that this is kind of like the hypothetical you gave with age, where it's an eligibility factor. And so they use the phrase actual innocence of the death penalty. And so it's exempt from that rule. This isn't a case where the defendant purposely waived it. You have to be cognizant of the circumstances here. The defendant was at the end of the sentencing hearing, and Hall came out, which really changed the landscape. And they were preparing to do their closing arguments. They were questioning the last witness. Hall came out on May 27th. They literally filed this motion May 28th. They scrambled to file it. It's not perfect, certainly, but it does raise the intellectual disability claim. Just a couple of other things I wanted to clean up. Mr. Valente said, well, you can't have both a cognitive disorder from brain damage and intellectual disability. And that's just not true. Two things. The courts have repeatedly found intellectual disability based on brain damage. And we cite those cases in our brief. And the DSM-5 on page 38 specifically says, quote, when intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned. And lastly, I would just say about what the Supreme Court has said about the developmental period. Clearly, the reference to age 18 in Atkins was the epitome of passing dicta. It was not considered dicta. Age onset was not an issue. The court wasn't adopting. It wasn't disputed. It wasn't addressed in the briefs. The issue in Atkins was, is there some kind of exemption for mental retardation? The court made clear in Atkins and later that it was leaving it to the lower courts to work out that definition. Atkins didn't deal with the Federal Death Penalty Act. And finally, the Supreme Court in Hall and more in subsequent cases has retreated from that age 18 formulation. And again, the last point I want to make in my last minute, Mr. Valenti talked about the states. We disagree with sort of where the states line up. If you look at our reply brief, we think it's 12 have age 18 and 12 don't. And I think, if anything, that's similar to the breakdown in Hall that favored the defendant. It certainly doesn't favor the government. Also, I don't think the division of the states is that significant for informing the interpretation of the statute or the current scientific standards, which the Supreme Court really in more said is the guiding star for determining intellectual disability. Thank you, Your Honor. Thank you, counsel. The case has been thoroughly briefed and very well argued, and we'll take it under advisement.